UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

PAMELA HIGGINS,

        Plaintiff,

v.

TOWN OF CONCORD, KATE HODGES,
and CHRISTOPHER WHELAN, in
their individual capacities,

        Defendants.

No. 16-CV-10641-DLC

**MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (DKT. NO. 71)**

Cabell, U.S.M.J.

    Pamela Higgins worked for the town of Concord (the Town) for over 25 years before being forced from her job in 2016. She contends that she was terminated in retaliation for taking leave to care for her ill spouse, and she has sued the Town and two supervisors for violation of the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601, and for violation of her rights to procedural and substantive due process. The defendants move for summary judgment. They argue that Higgins' claims, if not barred by a "last chance agreement" she signed, lack merit because they did not retaliate against her and she resigned voluntarily. For

the reasons discussed below, the motion will be granted on the plaintiff's due process claims but denied on her FMLA claim.

## I.   THE PARTIES

The plaintiff worked for the Town from 1989 to 2016.  Defendant Chris Whelan was at all relevant times the Town Manager.  Defendant Kate Hodges was at all relevant times the Assistant Town Manager and the plaintiff's direct supervisor.

## II.   RELEVANT FACTS

Broadly speaking, the plaintiff enjoyed a long and positive tenure with the Town until the middle to latter part of 2015.  She began working for the Town's Recreation Department full-time in 1989 and became its Assistant Director in 2000.  In January 2015 the director of the Recreation Department retired and Whelan appointed Higgins and another person named Laura Lunig ("Lunig") to serve as acting co-directors.  Defendants' Statement of Material Facts in Support of Their Motion For Summary Judgment ("Defendants' SUF"), at ¶¶ 15-16.

In February 2015 Whelan appointed Hodges to replace the recently retired Assistant Town Manager.  Defendants' SUF, at ¶ 17.  As Whelan had observed the Recreation Department to be in some state of disarray, he informed Hodges that past problems the Recreation Department had experienced would not be tolerated in

the future.  Id., at ¶¶ 19-20.  This concern was later conveyed to Higgins.  Id., at ¶ 21.

On June 18, 2015, Hodges and Higgins met for Higgins' annual performance review.  Hodges rated Higgins a "top performer," an excellent employee and a joy to work with.  Id., at ¶ 26; Local Rule 56.1 Statement of Material Facts ("Plaintiff's SUF"), at ¶ 13.  On another occasion that same month, Hodges informed Whelan that she thought Higgins was doing well, and that she was excited to see Higgins progress in her role as Acting Director. Plaintiff's SUF, at ¶ 15.

In July 2015, Lunig resigned and Whelan appointed Higgins as Acting Director on a temporary basis, with plans to evaluate her performance sometime during the fall.  Plaintiff's SUF, at ¶ 8; Defendants' SUF, ¶ 39.

Sadly, however, Higgins was at around the same time experiencing tumult in her personal life.  In March 2015, shortly after she had assumed the co-director role, Higgins' husband suffered a heart attack.  Defendants' SUF, at ¶ 22.  And then, in June 2015, the couple learned that he was suffering from lung cancer.  Id., at ¶ 27.  Higgins informed Hodges that she would need to attend appointments with her husband.  Hodges told her to take all the time she needed and she subsequently informed Whelan that Higgins was taking time to attend medical appointments with

her husband.   Id., at ¶¶ 27, 28; Plaintiff's SUF, at ¶¶ 16, 20.
Hodges also asked Higgins if she wanted to take some time off,
work part time or set an alternative work schedule.   Plaintiff's
SUF, at ¶ 21.   Higgins responded that working was therapeutic so
she declined to pursue any of those options.   Id.; Defendants'
SUF, at ¶ 30.

Beginning in or around the fall of 2015, however, things began
to go downhill and a sequence of events, not all necessarily
related, led to a breakdown in the parties' relationship.   Among
them, Higgins in September failed to complete the Recreation
Department's capital plan as she had been tasked.   She sent an
email to Jon Straggas ("Straggas"), another Recreation Department
employee, saying "[she] pleaded stupid on the capital plan."
Defendants' SUF, at ¶ 41.   Hodges and Straggas instead prepared
the capital plan together.   Id.

In November 2015 Hodges became concerned that Higgins was
missing scheduled meetings and she asked Foley to compile
statistics on Higgins' attendance and absences for the first half
of 2015.   Id., at ¶ 51.   Hodges, Foley and Whelan also met with
Higgins to review her performance as the Acting Director.   Id., at
¶ 49.   Higgins presented her "vison" for the department but Whelan
apparently was not impressed.   Id.

4

At around the same time, Hodges called Straggas to discuss her frustration that Higgins was missing meetings because of her need to spend time with her husband.  Hodges was concerned about the department's ability to adequately perform its work and she asked Straggas whether there were any matters within the department that might concern Whelan and that she should know about. Plaintiff's SUF, at ¶¶ 24-25.  Straggas raised two matters.  He told Hodges that (1) Higgins was playing tennis two mornings a week during business hours, and that (2) another employee was conducting personal training lessons during work in violation of town policy, and with Higgins' knowledge.  Id.

Regarding Higgins' tennis playing, there apparently was some precedent for this practice; the former Recreation Department Director had allowed Higgins to play tennis twice a week during regular business hours and Higgins had simply continued the practice after being made Acting Director.  Defendants' SUF, at ¶ 10.  Moreover, Higgins worked over 44 hours per week despite playing tennis, and apparently also did not have a set schedule or specified work hours.  Plaintiff's SUF, at ¶¶ 18, 32.  Nonetheless, Hodges came to believe that Higgins had missed some scheduled work meetings because she was playing tennis, and had moreover misled Hodges to believe she was unavailable or doing something else when in fact she was playing tennis.  Defendants' SUF, at ¶¶ 45-47.

5

Regarding the report of an employee conducting personal training sessions, the Town initiated an investigation in January 2016.  On January 7, 2016, Hodges and Foley interviewed Higgins. Defendant's SUF, at ¶ 60.  They instructed her (as they similarly instructed other Town employees with whom they met) not to discuss the investigation with anyone else in the Recreation Department, and to immediately report back if anyone approached to talk about the investigation.  Id., at ¶¶ 62-63.  Foley indicated that it would be a "fireable offense" if Higgins discussed the investigation with anyone, although Higgins does not remember Foley using that specific phrase.  Defendants' SUF, at ¶¶ 64-65.

Foley and Hodges also interviewed a Town employee named Karen Bush ("Bush").  When they instructed Bush not to discuss the investigation with anyone else, Bush asked whether that meant she also could not discuss the investigation with Higgins.  Hodges replied, "It's OK, [P]am knows we are questioning staff."  Bush interpreted this to mean that she was permitted to speak with Higgins about the investigation.  Plaintiff's SUF, at ¶ 47. Indeed, Bush thereafter approached Higgins and asked her about the investigation.  Id., at ¶ 48.  Higgins acknowledged Bush's question but did not make any substantive statements regarding the investigation.  Id.  For her part, Higgins similarly raised the

topic of the investigation in conversation with Straggas. Defendants' SUF, at ¶ 67.

In response to these interactions, Hodges and Foley confronted Higgins and asked her if she had spoken with anyone about the investigation. Id., at ¶ 68. Higgins initially denied speaking to anyone but then admitted that she did speak to both Straggas and Bush. Id. By contrast, no one confronted Bush even though it was she who had approached Higgins. Similarly, no one apparently confronted Straggas despite the fact that he also spoke to others and even sent text messages regarding that fact to Hodges. Plaintiff's SUF, at ¶ 50.

At around the same time, on January 6, 2016, Higgins received FMLA paperwork from Foley and submitted a request for intermittent FMLA leave. Defendants' SUF, at ¶ 56. Higgins told Hodges that her husband would begin radiation treatment in five days. Plaintiff's SUF, at ¶ 35. Foley and Hodges both notified Whelan by email later that day that Higgins would be exercising her leave rights under the FMLA. Id., at ¶ 37.

One week later, on January 13, 2016, Higgins was demoted from Acting Director to her prior role as Assistant Director of the Recreation Department. Defendants' SUF, at ¶ 73. Hodges told Higgins that she was demoted because Hodges could not trust her and because she believed Higgins had intentionally concealed her

7

tennis playing from her.   Id.   According to Straggas, however, Hodges told him that she demoted Higgins "because of [her husband's] illness and the time that she was having to spend with that, [and because] she thought [Higgins] was going to be more effective as the Assistant Director rather than running the entire department."   Plaintiff's Exhibit D, Straggas Dep. 99: 2-20; Plaintiff's SUF, at ¶ 60.

In addition to demoting Higgins, Whelan and Town officials were around the same time also discussing whether to simply terminate her.   The Town's outside counsel opined that Higgins' failure to refrain from discussing the internal investigation with others provided grounds for termination, and Foley agreed.   Hodges intervened however and persuaded officials to offer Higgins a Last Chance Agreement ("LCA") in lieu of termination.   Defendants' SUF, ¶¶ 3, 69-70.

On January 21, 2016, Hodges met with Whelan and gave her two copies of a LCA.   Hodges told Higgins that although it might be difficult for her to accept, Straggas was now going to be in charge of all matters relating to a Recreation Department facility known as the Beede Center, including business, staff and budget issues, and that Higgins no longer had any authority regarding Beede Center operations.   Hodges explained that Straggas was working to establish himself as a new manager and it would be awkward to have

8

her underfoot. Plaintiff's Exhibit 21, Kate Hodges' Answer to Plaintiff's First Set Of Interrogatories No. 6.

With respect to the LCA itself, it provided among other things "that with respect to any misconduct by [Higgins] involving a failure to follow directions," her employment would be deemed at will," that at Whelan's "sole discretion" any misconduct " [would] result in immediate termination," that Higgins waived "any and all rights she may have to file or assert any claim, complaint, grievance, appeal, or other action in any forum of any kind, including court, in connection with any further disciplinary action, including termination," that Higgins was "given the opportunity to consult with a representative of her choosing prior to signing [the LCA]," and that she entered into the LCA "voluntarily." Defendants' SUF, at ¶ 75; Defendants' Exhibit S, Last Chance Agreement Between The Town Of Concord and Pamela Higgins.

On January 25, 2016, four days later, Higgins signed the LCA. Defendants' SUF, at ¶ 77.

Two days later, on January 27, 2016, Whelan convened a budget meeting with Town finance managers to discuss funds pertinent to the Recreation Department. Higgins, Straggas and Hodges also attended the meeting. On three occasions during the meeting Whelan posed a question to Straggas regarding the Beede Center. On each

occasion, Straggas began speaking but Higgins interrupted and spoke over him and answered the question.   Whelan eventually adjourned the meeting and asked Hodges to set up a separate meeting with only Straggas so he could speak to him without Higgins interrupting.   Plaintiff's Exhibit 21, Kate Hodges Answer to Plaintiff's First Set of Interrogatories; Defendants' SUF, at ¶ 79.   Whelan subsequently complained to Hodges about Higgins' behavior.  Id.

Then, about two weeks later on February 11, 2016, an employee complimented Straggas at a meeting on how his staff had handled a near-drowning incident.   Id., at ¶ 80.   Higgins was present and interrupted the conversation in a manner that upset Straggas.  Id., at ¶ 80.

On the following day, February 12, 2016, Higgins sent a long email of apology to Hodges.   Among other things, Higgins stated "I owe you and Jon [Straggas] an apology for my behavior at the HS meeting yesterday.  I sincerely apologize.  It was inexcusable.  I felt so awkward and once I star[t]ed I didn't know how to stop and shut up.  My behavior was very troubling to me and of course I couldn't sleep last night because of it.   Jon and I had a long discuss [sic] to clear the air and I did apologize to him.  You will not see that behavior again."   Defendants' SUF, at ¶ 81; Defendants' Exhibit U, Pam Higgins' Email to Kate Hodges, re:

Sincere Apology, February 12, 2016.  Higgins also referenced the January 27th budget meeting where Whelan had gotten upset, stating, "I can only say that I am sorry."

The apology did not have the desired effect.  On or about February 19, 2016, Hodges notified Higgins by letter that she was being placed on paid administrative leave for violating the LCA, and was likely to be terminated the following week.  Hodges and Foley met with Higgins at around the same time and told her that she could either resign or face recommended termination. Defendants' SUF, at ¶ 82.

On February 23, 2016, Higgins tendered her resignation effective on or before April 5, 2016.  Defendants' SUF, at ¶ 85.

### III. <u>THE MOTION FOR SUMMARY JUDGMENT</u>

Following prior litigation the operative complaint contains two counts.  Count I alleges that the defendants retaliated against the plaintiff for taking leave to assist her stricken husband, in violation of the FMLA.  Count II alleges that the defendants deprived the plaintiff of her procedural and substantive due process rights under the 14th Amendment.  The defendants argue that the claims are barred because Higgins waived her right under the LCA to a pre-termination hearing or to bring a court action challenging her termination.  The defendants argue that even assuming the claims are not barred, the plaintiff resigned

11

voluntarily and has not adduced sufficient evidence of unfair treatment to create a triable issue of fact.

## IV.   <u>LEGAL STANDARD</u>

A court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of "assert[ing] the absence of a genuine issue of material fact and then support[ing] that assertion by affidavits, admissions, or other materials of evidentiary quality." *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003).  Once the moving party meets that burden, in order to avoid summary judgment, the opposing party must "show that a factual dispute does exist, but summary judgment cannot be defeated by relying on improbable inferences, conclusory allegations, or rank speculation." *Fontanez-Nunez v. Janssen Ortho LLC*, 447 F.3d 50, 54-55 (1st Cir. 2006) (*quoting Ingram v. Brink's, Inc.*, 414 F.3d 222, 228-29 (1st Cir. 2005)). Indeed, the opposing party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Clifford v. Barnhart*, 449 F.3d 276, 280 (1st Cir. 2006) (*quoting Triangle Trading Co. v. Robroy Indus. Inc.*, 200 F.3d 1, 2 (1st Cir. 1999)).

When determining whether summary judgment is appropriate, "a court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor." *Id.* (*citing Nicolo v. Philip Morris, Inc.*, 201 F.3d 29, 33 (1st Cir. 2000)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)) (internal quotation marks omitted).

## V.   DISCUSSION

### A. Validity of the Last Chance Agreement

Under the LCA, any misconduct by Higgins "involving a failure to follow directions" would result in her employment being deemed at-will, and could also result in her "immediate termination" at Whelan's discretion. The LCA also provided that Higgins waived her right to a pre-discipline/pre-termination hearing in such an instance, and also waived her right to subsequently bring a court action over any disciplinary action, including termination.

It is settled law in the First Circuit that agreements containing waivers of an employee's right to process or to pursue constitutional claims as consideration for resolving an employee dispute, such as the LCA the plaintiff signed in this case, are

13

valid and enforceable where a defendant/employer establishes that the waiver was made knowingly and voluntarily. See *Rivera-Flores v. Bristol-Myers Squibb Caribbean*, 112 F.3d 9, 13 (1st Cir. 1997)(waiver and release of ADA claims valid where there was no showing of lack of capacity to execute it knowingly and voluntarily, and employee had time to ask questions before signing); *Smart v. Gillette Co. Long-Term Disability Plan*, 70 F.3d 173, 181 (1st Cir. 1995)(employee waiver of rights enforceable provided it is knowing and voluntary); *American Airlines, Inc. v. Cardoza-Rodriguez*, 133 F.3d 111, 117 (1st Cir. 1998)(same).

The First Circuit has adopted a totality of the circumstances approach to determine whether a waiver is knowing and voluntary. *Smart v. Gillette Co. Long-Term Disability Plan*, 70 F.3d at 181. Under this approach a court looks to a non-exclusive set of six factors, including: (1) the plaintiff's education and experience; (2) the parties' respective roles in determining the provisions of the waiver; (3) the clarity of the agreement; (4) the time the employee had to study the agreement; (5) whether the plaintiff had independent advice such as from counsel; and (6) the consideration for the waiver. *Id.* at 181 n. 3. Not all factors must be present before a release can be enforced; the principal inquiry remains whether the employee's waiver can be characterized as knowing and voluntary in the totality of the circumstances. *Melanson v.*

14

*Browning-Ferris Industries, Inc.*, 281 F.3d 272, 276 (1st Cir. 2002).

Applying these factors here, the court finds that the plaintiff knowingly and voluntarily executed the LCA. First, the plaintiff has a Bachelor of Science degree and a Master's degree in management, and she had worked in a professional capacity for the Town for over 25 years. At a minimum, the plaintiff's background adequately equipped her to make an informed and rational decision to accept or reject the LCA.

With respect to the second, third and fourth factors, it does not appear that the plaintiff had a role in negotiating any of the LCA's provisions but the LCA is, to this court, relatively clear and easy to understand, and the plaintiff demonstrably had time to study it where she received it on January 21st but did not sign it until January 26th. With respect to the last two factors, there is also no dispute that Higgins had the opportunity to consult with an attorney if she wished, and she received consideration for entering into the LCA, namely the agreement to forego terminating her employment.

Considering all of these factors together, and drawing all reasonable inferences in the plaintiff's favor, no reasonable juror could conclude that the plaintiff did not knowingly and voluntarily enter into the LCA. Accordingly, the court finds that

15

the LCA, along with its provisions waiving the right to a pre-termination hearing or to challenge the plaintiff's termination for violating the LCA by way of a court action, including this lawsuit, is valid and enforceable.

Against this backdrop, the court considers each of the plaintiff's claims on the merits.

### B. Procedural Due Process

The essence of the plaintiff's procedural due process claim is that the defendants terminated her without first affording her the right to a pre-termination hearing. As noted above, though, the plaintiff explicitly waived her right to a pre-termination hearing in executing the LCA. Summary judgment will therefore enter in the defendants' favor on this claim. *See e.g. Kelly v. New York City Dep't of Envtl. Prot.*, 3:13-CV-1110, 2014 U.S. Dist. LEXIS 27039 *20 (N.D.N.Y. March 4, 2014).

### C. Substantive Due Process

The gravamen of the plaintiff's substantive due process claim is that the defendants fabricated instances of misconduct in order to create an environment where they justifiably could foist the LCA upon her, and then recast benign post-LCA incidents as instances of misconduct so they could justify terminating her under the agreement.

At least a portion of this claim is barred by the LCA. Ostensibly, the defendants intended to terminate the plaintiff

16

because she failed to heed the directive that she disassociate herself from all activities and functions concerning the Beede Center.   Because the LCA identified the failure to follow directions as one of the bases of misconduct that would warrant termination, and because the plaintiff waived her right to bring a court action for "any further disciplinary action" based on her alleged misconduct, including a termination, she has waived the right to challenge her termination here.

Having so found, this does not really dilute the thrust of the substantive due process claim where the plaintiff has not waived her claim that the defendants fabricated instances of misconduct in order to induce her to sign the LCA and to set the stage for her subsequent ouster.

Still, the court finds that the plaintiff has not adduced sufficient evidence of such a grand scheme to allow the substantive due process claim to survive beyond summary judgment.   In order to establish a substantive due process claim, a plaintiff must show that the acts were so egregious as to shock the conscience, and that they deprived her of a protected interest in life, liberty, or property.   *Pagan v. Calderon,* 448 F.3d 16, 32 (1st Cir. 2006).   As the court indicated previously in denying the defendants' motion to dismiss, the plaintiff, in order to meet this standard, would essentially need to prove *all* of the factual

17

allegations she had leveled against the defendants, that is, that
she had never been disciplined in the 27 years prior to engaging
in protected FMLA conduct, that the defendants targeted her
specifically because she had engaged in protected FMLA conduct,
that they falsely manufactured disciplinary issues as a way to
impose the LCA on her, that they offered her the LCA at an
emotionally vulnerable time when she had recently been demoted and
was cleaning out her office, that she was told in unambiguous terms
that she would be terminated if she did not sign the LCA, and that
they then deliberately concocted a breach of the LCA so they could
invoke the agreement to justify the plaintiff's termination.  The
evidence here does not support all of these allegations.

To be sure, the evidence in the record amply reflects the
precipitous breakdown in the parties' relationship from 2015 into
2016, as well as the increasing level of scrutiny the defendants
seemed to apply to the plaintiff's movements and conduct.  However,
the evidence falls short of showing a broad conspiracy-minded
scheme that shocks the conscience and amounts to a deprivation of
a protected interest.  Among other things, it is undisputed that
the plaintiff did miss some meetings, did play tennis during
working hours, did fail to complete timely certain key tasks such
as the capital plan, and did fail to abide by explicit instructions
not to disclose information relating to the Town's internal

investigation.  For her part, the plaintiff does offer various explanations to place some of these checkered events in context. Still, though, these facts, taken together, tend to mute somewhat the severe image urged by the plaintiff of a workplace united against her and intent on her removal.  In the court's view, even assuming the defendants acted in bad faith, no reasonable juror incorporating these facts could conclude that the defendants engaged in egregious, conscious shocking behavior in presenting Higgins with the LCA or thereafter in determining that she had breached it.  Accordingly, the defendants are entitled to summary judgment on this claim.  *See e.g., Kraft v. Larry A. Mayer Univ. of N.H.*, No. 10-cv-164-PB. 2012 U.S. Dist. LEXIS 8427 (D. N. H. January 25, 2012)(allowing summary judgment where, even assuming plaintiff's termination resulted from defendant's retaliatory animus and that other college administrators condoned the retaliatory termination, their bad faith motivation was insufficient to amount to conscience-shocking behavior).

### D. Violation of the FMLA

The plaintiff contends that the defendants retaliated against her for taking leave to care for her husband, by demoting her, imposing the LCA upon her, and ultimately terminating her.  Whereas the LCA partially or completely barred the plaintiff's due process claims, it does not bar her FMLA claim because the FMLA prohibits

an employer from inducing an employee to waive her prospective rights under the FMLA.  29 C.F.R. § 825.220(d); *see also Paylor v. Hartford Fire Ins. Co.*, 748 F.3d 1117, 1122 (11th Cir. 2014); *Whiting v. The Johns Hopkins Hosp.*, 416 Fed. App'x. 312, 314 (4th Cir. 2011); *Faris v. Williams WPC-I, Inc.*, 332 F.3d 316, 320 (5th Cir. 2003).  Accordingly, notwithstanding any language in the LCA to the contrary, the plaintiff has not waived any portion of her FMLA retaliation claim by entering into that agreement.  Turning then to the merits, I find that summary judgment is not appropriate because there is a genuine dispute of fact as to whether the defendants retaliated against the plaintiff for taking FMLA leave.

To begin, the FMLA entitles eligible employees to take up to a maximum of twelve weeks of leave for a family member's medical reason and return to the same or an equivalent employment.  29 U.S.C. § 2612(1)(1)(D).  An employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided [by the FMLA]," 29 U.S.C. §2651(a)(1), or "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful [by the FMLA]."  29 U.S.C. § 2615(a)(2).  Employers who violate the FMLA are liable to the employee for damages and such equitable relief as may be appropriate.  29 U.S.C. § 2617(a)(1).

A plaintiff alleging retaliation for taking FMLA leave must establish that: (1) she availed herself of a protected right under the FMLA; (2) she suffered an adverse employment action; and (3) there is a causal connection, that is, the employer took the adverse action because of the protected reason. *Gourdeau v. City of Newton*, 238 F. Supp. 3d 179, 184-185 (D. Mass. 2017). When a plaintiff presents only circumstantial evidence of retaliation, retaliation claims are analyzed under the same *McDonnell Douglas* burden-shifting framework used to assess discrimination claims. *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 160 (1st Cir. 1998); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Accordingly, because the plaintiff does not really proffer any direct evidence of retaliation, the court examines her retaliation claim using the burden-shifting framework.

Under this framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination or retaliation. *McDonnell Douglas Corp., 411 U.S. at 802.* If she establishes a *prima facie* case, the burden of production shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse action. *Id.* If the employer succeeds in doing so, the burden then shifts back to the plaintiff to demonstrate that the employer's proffered reason was not the true reason for the employment decision. *Id*. at 803.

21

Applied here, the court finds that the plaintiff has met her burden of establishing a *prima facie* violation of the FMLA. First, there is no dispute that the plaintiff availed herself of a protected right where she began taking time in or around the middle of 2015 to assist her husband with his medical needs, and formally requested FMLA paperwork on January 6, 2016. There is also no dispute that the plaintiff suffered adverse employment actions where she was demoted, allegedly forced to sign the LCA, and ultimately forced from her position.

With respect to the "causal connection" element, the court finds that the plaintiff has met her burden. First, while not dispositive, it is probative that the plaintiff was demoted just one week after formally requesting FMLA paperwork. *See e.g., Germanowski,* 854 F.3d 68, 74 (1st Cir. 2017)(noting that a very close temporal proximity between protected activity and an adverse employment action can satisfy a plaintiff's burden of showing causal connection). Second, although the defendants argue otherwise, the facts in a light most favorable to the plaintiff allow for an inference that the defendants took actions against the plaintiff because she took protected leave. On this issue, the defendants argue that Higgins cannot show a causal connection because she cannot show that Whelan as the ultimate decision maker was aware that she was taking FMLA leave. There is contrary

evidence, however, that Whelan did know because Hodges informed him in the summer of 2015 that Higgins was dealing with a family illness, and apparently informed him and Foley by email in January 2016 that the plaintiff needed to take FMLA leave.  If true, these facts would be sufficient to support the inference that Whelan knew the plaintiff was taking protected leave to deal with a family member's medical needs.  *See e.g., Byrne v. Avon Products, Inc.*, 328 F.3d 379, 382 (7th Cir. 2003)(knowledge element satisfied where employer knows of the employee's need for leave, even if employee does not mention statute or demand its benefits).

Even assuming Whelan did not have actual knowledge that the plaintiff was taking protected leave, Hodges knew as much and her knowledge can be imputed to Whelan under a "cat's paw" theory. *Cariglia v. Hertz Equip. Rental Corp.,* 363 F.3d 77 (1st Cir. 2004); *Harlow v. Potter,* 353 F. Supp. 2d 109, 117 (D. Me. 2005).  To invoke the cat's paw analysis, the plaintiff must point to evidence sufficient to show that (1) Hodges exhibited discriminatory animus and (2) Whelan acted as the conduit of that prejudice.  *Harlow,* 353 F. Supp. 2d at 115.  In the court's view, even if not overwhelming, there is enough evidence to raise a triable question as to whether Hodges acted as a biased supervisor and facilitated the plaintiff's demotion and termination by recommending the same to Whelan.  In that regard, Whelan admitted that his perception of

Higgins' performance was based in part on information gleaned from Hodges.  Plaintiff's SUF, at ¶ 23.

As the plaintiff has made out a *prima facie* case of FMLA retaliation, the burden shifts back to the defendants to articulate a non-discriminatory reason for Higgins' treatment.  *Hodgens,* 144 F.3d at 160.  The defendants counter that they disciplined the plaintiff because of the instances of misconduct noted above, not because she took protected leave, and thereafter forced her to leave in lieu of termination only after she committed the same sort of misconduct that impelled the LCA to begin with.  As there is evidence as noted above that the plaintiff was responsible for the conduct as alleged, the court finds that the defendants have articulated a legitimate reason for demoting and eventually terminating her, and the burden now shifts back to the plaintiff to show that the defendants' explanation was pretextual and in reality motivated by her decision to take protected leave. *Hodgens*, 144 F.3d at 160.

The court finds that the plaintiff has met her burden.  The record shows that the plaintiff had worked for the Town of Concord for over two decades, apparently without incident, and had been rated a "top performer" and "joy to work with" as recently as June 2015.  Notably, the parties' relationship began to change shortly after this positive assessment, and around the time the plaintiff

informed Hodges of her husband's cancer diagnosis and that she would need to take leave to assist him.   There is evidence that following this development, Hodges became frustrated and had numerous conversations with the HR director about Higgins missing meetings.   There is also evidence that Hodges and Town officials treated the plaintiff differently than other similarly situated employees, in particular by disciplining the plaintiff alone for speaking to others about the internal investigation despite evidence that Straggas and Bush had done the same.   And perhaps most notably, there is evidence that Hodges told Straggas that the plaintiff was demoted because she was taking so much time from work to care for her husband.   Based on the foregoing, a rational juror could find that the defendants' stated reasons for acting as they did were pretextual, and that they were instead taken because the plaintiff took protected leave.   Summary judgment is therefore not appropriate on this claim.

## VI.   **CONCLUSION**

For the foregoing reasons, the Defendants' Motion for Summary Judgment (Dkt. No. 71) is GRANTED in part and DENIED in part. Summary Judgment will be entered on the plaintiff's due process claims but denied on the claim of FMLA retaliation.

/s/ Donald L. Cabell
DONALD L. CABELL, U.S.M.J.

DATED:  July 23, 2018